UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Honeywell International Inc.,

*Plaintiff*,

v.

CITGO Petroleum Corporation,

*Defendant*.

Civil Action No. <u>5:19-cv-1219</u> (GLS/ATB)

**COMPLAINT**

Honeywell International Inc. ("Honeywell" or "Plaintiff"), by and through its undersigned counsel, for its Complaint in this action, alleges the following:

## PRELIMINARY STATEMENT

1.      Honeywell brings this civil action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 *et seq.*, and New York State law, as set forth below, for costs incurred and to be incurred as a result of releases of petroleum, petroleum-related hazardous substances, and non-petroleum-related hazardous substances by CITGO Petroleum Corporation and/or its predecessors ("CITGO" or "Defendant") into Onondaga Lake, its tributaries, and onto land areas which drain into Onondaga Lake in Onondaga County, New York.

2.      These releases of petroleum, petroleum-related hazardous substances, and non-petroleum-related hazardous substances have caused contamination of sediment and surface

1

water in and around Onondaga Lake, contamination of sediment, soil, and groundwater at state wetland SYW-12, as well as contaminating or otherwise harming fish and other aquatic life, and have caused conditions in and around the Lake that posed, pose, or may pose a threat of harm to public health and safety.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to sections 113(b) and 113(g)(3) of CERCLA, 42 U.S.C. §§ 9613(b), (g)(3), section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1331, 1367.

4.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367 for claims based upon New York common law that arise out of a common nucleus of operative facts shared with CERCLA and OPA claims.

5.      This Court has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

6.      Venue is appropriate in the Northern District of New York pursuant to 28 U.S.C. § 1391 and section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases or threatened releases of hazardous substances that gave rise to this action occurred or will occur in this district.

## THE PARTIES

7.      Honeywell is a Delaware corporation with its principal place of business at 115 Tabor Road, Morris Plains, New Jersey 07950.

8.      Defendant CITGO Petroleum Corporation is a Delaware corporation with its principal executive offices at 1293 Eldridge Parkway, Houston, Texas 77077-1670.

## FACTS

### *Onondaga Lake*

9.      Onondaga Lake is located in Onondaga County, New York.

10.     Onondaga Lake is a 4.6-square-mile lake, approximately 4.5 miles long and 1 mile wide, with an average water depth of 36 feet and two deep basins (a northern basin and a southern basin) that have maximum water depths of approximately 62 and 65 feet, respectively.

11.     Onondaga Creek is a tributary of Onondaga Lake.

12.     For over 100 years, Onondaga Lake received discharges and releases of industrial wastes and wastewaters both directly and through its tributaries.

13.     Sediments in Onondaga Lake became contaminated with a variety of petroleum products, petroleum-related hazardous substances, and non-petroleum-related hazardous substances, including those it received through industrial and sewage discharges, surface runoff, and contaminated groundwater discharges.

14.     Numerous contaminants that were discharged into Onondaga Lake, including but not limited to metals (including arsenic, copper, chromium, lead, and mercury), aromatics, chlorinated benzene, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs"), were determined by the U.S. Environmental Protection Agency ("EPA") and the New York State Department of Environmental Conservation ("DEC") to create risk to human and ecological receptors.  These contaminants were present in sediment in Onondaga Lake and are being addressed by remedial actions undertaken by Honeywell.

### *Honeywell's Cleanup of the Onondaga Lake Bottom Subsite*

15.     On June 23, 1989, pursuant to New York state law, DEC added Onondaga Lake to the New York State Registry of Inactive Hazardous Waste Disposal Sites.

16.     On December 16, 1994, pursuant to CERCLA, EPA listed Onondaga Lake and certain upland areas on the National Priorities List, thereby designating Onondaga Lake a Superfund Site.

17.     The Onondaga Lake Bottom has been defined as its own subsite (the "Onondaga Lake Bottom Subsite") and is also referred to as Operable Unit 2, or OU2.

18.     On June 27, 1989, the State of New York commenced a civil action against Honeywell's predecessor Allied-Signal Inc. ("Allied-Signal") in the U.S. District Court for the Northern District of New York under section 107 of CERCLA and under state environmental and common law.  *New York v. Honeywell Int'l Inc.*, No. 3:89-CV-00815-FJS-DEP.  In its suit, the State sought to compel Allied-Signal to investigate and remediate contamination in the sediments of Onondaga Lake and in associated upland areas.

19.     Allied-Signal (and after 1999, Honeywell) undertook a comprehensive Remedial Investigation and Feasibility Study ("RI/FS") of the Onondaga Lake Bottom Subsite under DEC oversight.  The RI/FS was completed in November 2004.

20.     On July 1, 2005, DEC and EPA, in consultation with the New York State Department of Health ("DOH"), jointly issued a Record of Decision ("ROD") for the Onondaga Lake Bottom Subsite.  The ROD details the selected remedy for the Lake and explains in detail how each component of the selected remedy complies with federal and/or state law requirements. Pursuant to the ROD, the selected remedy includes a mixture of sediment dredging, isolation capping, and thin layer capping, as well as certain other measures including the construction of a sediment consolidation area to contain dredged sediment.  The ROD also requires the implementation of institutional controls and long-term maintenance and monitoring of the remedy.

21.     The ROD estimates the total cost of the selected remedy at $451,000,000.

22.     The ROD-estimated costs do not incorporate inflation.

23.     On January 4, 2007, the U.S. District Court entered a Consent Decree between DEC and Honeywell (the "2007 Consent Decree") (attached hereto as Exhibit 1), which DEC executed pursuant to its delegated authority under CERCLA and its independent authority under New York state law.

24.     In the 2007 Consent Decree, Honeywell agreed to fund and implement the selected remedy set forth in the ROD pursuant to both CERCLA and New York state law.  Ex. 1 ¶ 14–15.

25.     The 2007 Consent Decree specifically states that Honeywell is obligated to implement the selected remedy pursuant to state law.  Ex. 1 ¶ 14.

26.     The 2007 Consent Decree further provides that "[t]o the extent authorized under. . . any applicable law, Honeywell shall be deemed to have resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2) for 'Matters Addressed' pursuant to and in accordance with this Consent Decree . . . Furthermore, to the extent authorized under 42 U.S.C. § 9613 (f)(3)(B) or other provisions of CERCLA, by entering into this judicial settlement of liability for the Matters Addressed herein, Honeywell may seek contribution from any person except those who are entitled to contribution protection under 42 U.S.C. § 9613 (f)(2)."  Ex. 1 ¶ 90.

27.     In consideration of Honeywell's compliance with the 2007 Consent Decree, New York State released Honeywell from any further "civil, judicial, or administrative action[s] under any federal, state, local or common law."  Ex. 1 ¶ 91.

28.     Honeywell completed the dredging required by the ROD in November 2014, one year ahead of schedule.  2.2 million cubic yards of Lake material were dredged.

29.     In September 2015, EPA concluded that implementation of the remedy was progressing as expected and noted that several process enhancements and modifications were implemented by Honeywell to improve overall dredge system performance and production capabilities.

30.     Honeywell completed the capping required by the ROD in December 2016.  Four hundred seventy-five acres of the Onondaga Lake Bottom Subsite were capped by Honeywell, with more than 3 million cubic yards of material.

31.     Honeywell completed the habitat enhancements required by the ROD in December 2017.

32.     In total, Honeywell has restored about 90 acres of wetlands and planted about 1.1 million native plants on the Onondaga Lake shore and along its tributaries.

33.     Honeywell is required to perform monitoring and maintenance of the remedy and habitat restoration for years to come.

34.     As a result of Honeywell's cleanup, the quality and utility of Onondaga Lake has dramatically improved.

35.     For example, in October 2014, DEC concluded that water quality conditions in the northern two-thirds of the Lake were, for the first time since 1940 (after 74 years), again suitable for swimming.

36.     Audubon New York presented Honeywell with its annual Thomas W. Keesee, Jr. Conservation Award for the cleanup and restoration of Onondaga Lake.  The award announcement highlighted Honeywell's leadership, the ambitious nature of the project, and

celebrated the return of the Lake to the Central New York Community as a healthy, sustainable asset for future generations.

37.     Various state and local government officials have expressed gratitude regarding the success of the Onondaga Lake cleanup and Honeywell's willingness to perform it.

38.     For example, former Onondaga County Executive Joanie Mahoney stated that "Honeywell's willingness to meet and exceed its obligations is the reason why we're standing here today.  I'm very proud to be partnering with them in this cleanup."

39.     Speaking to the cleanup of Onondaga Lake, former DEC Commissioner Joseph Martens stated that "Honeywell has been one of the most progressive and cooperative responsible parties to tackle such a significant environmental problem."

40.     The U.S. Department of Justice ("DOJ"), in a brief filed on behalf of EPA, stated that "while many companies operated at and near the Site during the 20th Century, Honeywell alone agreed to take responsibility for performing extensive and expensive cleanup work at the Site."  Memorandum in Support of Unopposed Request to Enter Consent Decree, *United States v. Honeywell Int'l Inc.*, No. 5:17-cv-01344-FJS-DEP (N.D.N.Y. Feb. 27, 2018), ECF No. 3-1 at 11.

### *Honeywell's Payment of EPA's Past Costs*

41.     On December 14, 2017, DOJ filed a civil action under section 107 of CERCLA seeking recovery from Honeywell of costs incurred by the United States in connection with response actions at the Onondaga Lake Superfund Site.

42.     On the same day, DOJ filed a notice of a proposed consent decree that resolved all Honeywell liability for these response costs.

43.     On April 17, 2018, the U.S. District Court for the Northern District of New York entered the consent decree ("2018 Response Costs Consent Decree") (attached hereto as Exhibit 2).

44.     The 2018 Response Costs Consent Decree requires Honeywell to pay $7.3 million in reimbursement of response costs incurred by the United States with respect to the Onondaga Lake Superfund Site.

45.     The 2018 Response Costs Consent Decree provides that "[t]he Parties further agree, and by entering this Consent Decree this Court finds, that the Complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which each Settling Party and each Settling Federal Agency has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B)."  Ex 2 ¶ 28.

46.     Honeywell made the payment required pursuant to the 2018 Response Costs Consent Decree on May 7, 2018.

### *Honeywell's Restoration of Natural Resource Damages*

47.     On December 20, 2017, DOJ filed a civil action under section 107(a) of CERCLA seeking recovery from Honeywell for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss, resulting from the releases of hazardous substances at or from facilities at the Onondaga Lake Superfund Site.

48.     On the same day, DOJ filed a notice of a proposed consent decree that resolves these claims under section 107(a) of CERCLA against Honeywell and Onondaga County for

natural resource damages ("NRD") resulting from the releases of hazardous substances at or from facilities at the Onondaga Lake Superfund Site.

49.     On March 14, 2018, the U.S. District Court for the Northern District of New York entered the consent decree ("2018 NRD Consent Decree") (attached hereto as Exhibit 3).

50.     The 2018 NRD Consent Decree provides that Honeywell will (1) implement and maintain 20 restoration projects to restore and protect wildlife habitat and water quality, and increase recreational opportunities at Onondaga Lake; (2) pay $5 million for future restoration projects to be undertaken by the Trustees; (3) pay $500,000 toward stewardship activities to protect and maintain restoration projects; and (4) pay $750,000 for Trustees' future oversight costs.

51.     The work and payment obligations under the 2018 NRD Consent Decree are estimated by DOJ to total $26 million.

52.     The 2018 NRD Consent Decree provides that "[t]he Parties further agree, and by entering this Consent Decree this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this Consent Decree constitutes a judicially-approved settlement pursuant to which each Settling Party has resolved liability to the United States for Natural Resource Damages within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B)." Ex 3, ¶ 82.

53.     Honeywell made the payments required under the 2018 NRD Consent Decree on April 10, 2018.

### *Honeywell's Investigation of SYW-12*

54.     The SYW-12 property is located at the southern end of Onondaga Lake along the southeastern shoreline of the Lake.

55.     The SYW-12 property is bounded by railroad tracks and the former Oil City area to the south and east, a barge canal to the south, and the Lake to the north and northwest.

56.     The area is currently approximately 40.7 acres but has expanded and contracted over time based on Lake depth and deposition of dredged and fill material.

57.     The area is currently owned by Onondaga County.

58.     Neither Honeywell nor its predecessors owned or operated at SYW-12.

59.     Nonetheless, Honeywell—with approval and oversight from DEC—began investigation at the SYW-12 property in 2006.

60.     Neither EPA nor DEC has ever formally concluded that Honeywell is a responsible party at SYW-12.

61.     No administrative or judicial settlement or order explicitly resolves any Honeywell liability for SYW-12.

62.     Honeywell has incurred and anticipates incurring significant costs in the investigation of contamination at SYW-12, all of which have been or will be incurred with DEC approval.

### *The Oil City Area*

63.     Oil City refers generally to a former industrial area in the City of Syracuse located northwest of the downtown business area.  The area is bounded by railroad tracks to the northeast, a barge canal to the southeast, and an interstate highway to the northwest.

10

64.     The Lake is located to the northwest of Oil City and is separated from Oil City by railroad tracks and SYW-12.

65.     The location of Oil City in relation to the Lake, the areas of the Onondaga Lake Bottom Subsite that were subject to dredging and/or capping, and SYW-12 is shown below:



66.     Oil City is comprised of multiple separate tax parcels formerly owned by CITGO and several other oil companies.

67.     The Oil City area was used as a bulk petroleum storage and distribution facility by CITGO and other oil companies from approximately the 1910s through the 1990s.

68.     Much of the former Oil City area was redeveloped over the course of the 1990s and early 2000s.  The area is now home to the Destiny USA shopping and entertainment center, which opened in 1990 as the Carousel Center mall, and an Embassy Suites by Hilton hotel, which opened in 2017.

### *The Barge Canal*

69.    Prior to 1918, goods were shipped to and from Syracuse via the historic Erie and Oswego Canals, which ran through the center of Syracuse at the southeast end of Onondaga Lake and along the north side of Onondaga Lake towards Liverpool, respectively.

70.    In the early 1900s, construction began on the New York State Barge Canal ("Barge Canal").

71.    As part of Barge Canal construction, the old Erie Canal was rerouted so that the newly constructed barge route passed by the northern end of Onondaga Lake.

72.    In order for goods to continue to be delivered to Syracuse by barge, the new route included a newly constructed spur that passed south through Onondaga Lake to a terminal at the southern end of the Lake (the "Syracuse Terminal").

73.    The Syracuse Terminal was located directly adjacent to the southwestern corner of Oil City.

74.    Construction of the Barge Canal spur in the Oil City area began around 1918.

75.    The Onondaga Creek channel, which historically flowed through the Oil City area, was diverted to connect to the Syracuse Terminal and was straightened and widened to allow for barge traffic.

76.    The completed Barge Canal spur forms the southwestern boundary of the Oil City area and connects the Syracuse Terminal and the Oil City area to the larger Barge Canal network via Onondaga Lake.

77.    The Barge Canal facilitated shipment of petroleum products to and from the Oil City area via oil barge through at least the early 1990s.

78.    Groundwater beneath Oil City flows towards the Barge Canal.

79.    The Barge Canal flows into Onondaga Lake.

***Oil City Operations***

80.    Historically, the Oil City area was broken into various oil terminals, certain of which were owned by CITGO at various times.  The following is a map of CITGO's parcels:



81.    The Oil City companies, including CITGO, arranged for transport and/or transported petroleum, petroleum-related hazardous substances, and non-petroleum-related hazardous substances to and/or from Oil City by barge, pipeline, train, and truck.

82.    A number of the Oil City companies, including CITGO, owned and operated tank barges and/or tugboats that transported petroleum products to and from Oil City.

83.    Erie Canal trip cards show that CITGO-owned barges were transporting diesel fuel to Oil City as early as 1929, the year that CITGO began operating the CITGO Terminal at Oil City.

84.     Upon information and belief, the Oil City companies, including CITGO, also arranged for the transport of petroleum product via barges owned or operated by other companies to and from Oil City.

85.     CITGO constructed a dock along the Barge Canal to facilitate shipping of petroleum products to and from its Oil City facilities.

86.     CITGO also constructed three pipelines for use in transferring petroleum products between barges and its storage tanks at Oil City.

87.     Barge transport of petroleum products to and from Oil City arranged for by the Oil City companies was dominated by heavier petroleum products, namely number 4 and number 6 fuel oils.

88.     In some years, 100% of the petroleum products transported to and from Oil City via barge were the heavier number 4 and number 6 fuel oils.

89.     Three major petroleum pipelines also transported petroleum products to Oil City.

90.     Petroleum, petroleum-related hazardous substances, and non-petroleum-related hazardous substances transported to Oil City via pipeline included gasoline as well as heavier petroleum products such as diesel and fuel oils.

91.     Petroleum products, wastes, and other hazardous substances were stored at Oil City in aboveground and underground storage tanks.

92.     Stored products were loaded or pumped onto trucks by the Oil City companies, including CITGO, for delivery throughout the Onondaga Lake basin.

### *CITGO's Ownership and Operation at Oil City*

93.     As set forth below in Paragraphs 94–151, which are incorporated fully herein, CITGO is the successor to the Crew Levick Co. and Cities Service Company's refining,

marketing, and transportation business, including the ownership and operation of a major petroleum storage and handling facility at Oil City from 1929 to 2004.

94.     This major petroleum storage and handling facility (the "CITGO Terminal") consisted of two parcels along Solar Street: a larger parcel at 545 Solar Street acquired in 1929, and a second parcel acquired in 1987 as part of CITGO's expansion of its Oil City operations.

95.     CITGO owned and operated the CITGO Terminal from 1929 until 2004, a period of 75 years.

96.     The Crew Levick Co., a Pennsylvania corporation, purchased and began operations at the first CITGO Terminal parcel in 1929.

97.     In 1936, the Crew Levick Co. merged into Cities Service Oil Co., a Pennsylvania corporation that assumed all operations, assets, and liabilities of its predecessor, including those relating to ownership and operation of the CITGO Terminal.

98.     In 1961, Cities Service Oil Co., a Pennsylvania corporation, merged into Cities Service Oil Co., a Delaware corporation that assumed all operations, assets, and liabilities of its predecessors, including those relating to ownership and operation of the CITGO Terminal.

99.     In 1965, Cities Service Oil Co. changed the name of its petroleum marketing and operating business to CITGO.

100.    Beginning in 1965, the CITGO Terminal operated as part of the CITGO petroleum marketing and operating business.

101.    The new CITGO name, emblem, and color scheme were developed with the aid of a New York research and design firm.

102.    The new CITGO name was designed to reflect Cities Service Oil Co.'s progressive new face, but also to make reference to CITGO's predecessor.

103.    Cities Service Oil Co. announced the CITGO name change in a major press conference held in New York City on May 4, 1965.

104.    All New York-based press, wire services, and trade representatives were invited to attend the May 4 conference.

105.    The CITGO name change applied to all of Cities Service Oil Co.'s petroleum facilities—including, without limitation, its well locations, gas processing plants, refineries, and service stations—across the 46 states where the company operated.

106.    The new CITGO name was adopted for use on property signs, automotive equipment, employee uniforms, fuel transports, corporate letterhead and business cards, checks and customer credit cards.

107.    Following the CITGO name change, Cities Service Oil Co. began a multi-million-dollar national advertising campaign promoting the tagline "Cities Service is CITGO now!"

108.    The advertisements appeared in newspapers, magazines, on television, and on the radio, including those released in New York.

109.    For example, in 1965, CITGO aired a TV commercial with the tagline "Cities Service is CITGO now!"  The commercial featured a car with a New York license plate.

110.    Cities Service Oil Co. also hired a New York City consulting firm to help its public relations department tell the story behind the CITGO name change.

111.    According to a Cities Service executive, the name change to CITGO was "the biggest and most complete marketing changeover ever made by any company."

112.    A news release by CITGO declared that "the CITGO changeover surpassed in scope anything of its kind ever conducted in the petroleum industry."

113.    After 1965, Cities Service Oil Co. was commonly referred to as CITGO, including in court filings.[1]

114.    After 1965, media outlets frequently referred to CITGO as the successor-in-interest to Cities Service Oil Co., and/or referred to Cities Service Oil Co. as CITGO's predecessor.

115.    By 1973, a report prepared for Cities Service Company noted that "to many motorists Cities Service is CITGO," and "[i]ndeed, among younger drivers, the name Cities Service may never have figured as an important element in the identification of the [Cities Service] Company's products—or, for that matter, of the [Cities Service] Company itself."

116.    In 1978, Cities Service Oil Co., a Delaware corporation, merged into Cities Service Company, a Delaware corporation that assumed all operations, assets, and liabilities of its predecessors, including those relating to ownership and operation of the CITGO Terminal.

117.    In 1983, Cities Service RMT Corporation was incorporated in Delaware as a wholly owned subsidiary of Cities Service Company.

118.    Following the incorporation of Cities Service RMT Corporation, on March 18, 1983 an Assignment and Assumption Agreement (the "1983 Agreement") was executed between Cities Service Company and Cities Service RMT Corporation.

---

[1] *Tire Sales Corp. v. Cities Serv. Oil Co.*, 637 F.2d 467, 469 (7th Cir. 1980) (court uses "Cities Service" and "CITGO" interchangeably); *Marietta v. Cities Serv. Oil Co.*, 414 F. Supp. 1029, 1031 (D.N.J. 1976) (same); *United States v. Hodges Company*, Transcript from March 9, 1983 Status Conference Hearing (same); *Swarthmore Co. v. Kaestner*, 258 Md. 517, 519 (1970) (same); *Howington v. Cities Services Oil Co.*, 129 Ga. App. 621 (1973) (same); *Atl. Richfield Co. v. F.T.C.*, 398 F. Supp. 1, 6 (S.D. Tex. 1975), aff'd, 546 F.2d 646 (5th Cir. 1977) (same); *Tire Sales Corp. v. Cities Service Oil Co.*, 410 F. Supp. 1222, 1224 (N.D. Ill. 1976) (same); *Burch v. Cities Services Oil Co.*, No. 114A 1976 WIL 16597, at *1 (Md. Cir. Ct. Apr. 12, 1976) (same).

119.    Pursuant to the 1983 Agreement, Cities Service Company merged its Refining, Marketing, and Transportation Division, which had been operating under the CITGO name since 1965 (the "CITGO Division"), into Cities Service RMT Corporation.

120.    Following the execution of the 1983 Agreement, Cities Service Company discontinued all of its petroleum refining, marketing, and transportation operations because the entire refining, marketing, and transportation business (i.e., the entire business operating under the CITGO name) had been divested to Cities Service RMT Corporation.

121.    Upon the merger of the CITGO Division into Cities Services RMT Corporation, Cities Service RMT Corporation became the entity known to the public as CITGO.

122.    Cities Service RMT Corporation, as a wholly owned subsidiary of Cities Service Company, had the exact same ownership as the former CITGO Division.

123.    Cities Service RMT Corporation acquired all of the CITGO Division's assets, which included all assets branded with the CITGO name.

124.    Cities Service RMT Corporation acquired all of the CITGO Division's business operations and activities, including all operations and activities associated with the CITGO brand.

125.    Cities Service RMT Corporation acquired all physical locations, real properties, and facilities housing the CITGO Division operations, including (without limitation) the CITGO Terminal in Syracuse.

126.    Cities Service RMT Corporation acquired all of the CITGO Division's employees who were necessary to operate and service the RMT Division's assets and business activities.

127.    Cities Service RMT Corporation acquired all of the patents and trademarks associated with the CITGO business, including (without limitation) the valuable CITGO brand.

18

128.    Cities Service RMT Corporation acquired all of the rights and benefits under contracts relating to the CITGO Division's operations, and expressly assumed all obligations under all contracts associated with the operations and business of the CITGO Division and debts associated with the CITGO business.

129.    In other words, Cities Service RMT Corporation assumed all the assets and liabilities of the CITGO Division necessary for the uninterrupted continuation of the CITGO business.

130.    Following the execution of the 1983 Agreement, Cities Service RMT Corporation changed its name to CITGO Petroleum Corporation.

131.    In a 2005 complaint, CITGO sought to receive full rights and benefits under Cities Service Company insurance policies covering environmental liabilities incurred prior to 1983 by arguing, among other things, that the rights and benefits under those policies had transferred from Cities Service Company to CITGO by operation of law.

132.    The court overseeing that 2005 complaint confirmed that in the 1983 Agreement, Cities Service Company conveyed to CITGO its insurance policies covering environmental liabilities incurred prior to 1983 and that CITGO was entitled to the rights and benefits under these policies for purposes of remediating environmental contamination, including environmental contamination contributed prior to 1983.

133.    In a previous litigation before this Court relating to environmental contamination originating in the Central New York region before 1983, *see United States v. Peirce*, No. 83-CV-1623, CITGO's counsel of record stated in an affidavit supporting CITGO's motion for summary judgment that "CITGO is the successor to Cities Service Company's marketing, refining, and transportation operations."

19

134.    In the published decision *United States v. Peirce*, this Court accepted that "Cities Service" was the "predecessor in interest" to CITGO. *United States v. Peirce*, 158 F.R.D. 16, 19 n. 3 (N.D.N.Y. 1994).

135.    In a published opinion involving a CITGO employee's tort claims against a CITGO contractor, a New Jersey court identified Cities Service Oil Co. as a "predecessor" to CITGO.  *Ramos v. Silent Hoist & Crane Co.*, 607 A.2d 667, 668 (N.J. Super. App. Div. 1992).

136.    In other environmental litigation relating to contaminating activities that were perpetrated before 1983, CITGO has not contested its successorship to Cities Service Company's environmental liabilities.[2]

137.    In a Consent Order between CITGO and DEC entered in 1999, CITGO agreed to remediate contamination at, arising from, and relating to the CITGO Terminal at Oil City without regard to when the contamination occurred.

138.    On its current website, CITGO states that its history began "[o]n September 2, 1910, [when Henry] Doherty founded the Cities Service Company" and that "[w]hile there has been a world of change over the past century, a lot of things are not so different after all."

139.    CITGO's website also states that it "celebrated its 100-year heritage" on September 2, 2010.

140.    CITGO is the successor-in-interest by de factor merger to Cities Service Company's CITGO Division, and is therefore liable for all contamination resulting from operations at the CITGO Terminal, including (without limitation) liability resulting from pre-1983 operations.

---

[2] *United States v. Citgo Petroleum Corp.*, No. 2:18-cv-00402-UDJ-KK (W.D. La. 2018); *NJDEP v. Amerada CITGO Corp.*, No. 1:08-CV-00312-VSB (S.D.N.Y. 2008); *United States v. Peirce*, 158 F.R.D. 16 (N.D.N.Y. 1994).

141.     CITGO's ownership and operation of the CITGO Terminal began in 1929 with the purchase of the parcel at 545 Solar Street.

142.     Beginning as early as 1929, CITGO owned and operated one or more tank barges that transported petroleum products to the CITGO Terminal.

143.     Upon information and belief, CITGO's tank barges transported petroleum products to and from the CITGO Terminal until at least the 1970s.

144.     In 1935, CITGO installed a dock at the Barge Canal and installed a pipeline connecting the dock to its tanks at the CITGO Terminal.  CITGO used the pipeline to transfer its products from barges to the tanks.

145.     CITGO also installed two pipelines connecting the CITGO Terminal to a nearby manifold owned and operated by a major petroleum pipeline.  CITGO used these pipelines to transfer petroleum products from the manifold to CITGO's tanks.

146.     In 1987, in order to expand its Oil City operations, CITGO acquired a second parcel which was also part of the CITGO Terminal.

147.     As of 1989, the CITGO Terminal included at least 10 above-ground storage tanks and had a total storage capacity of approximately 9.9 million gallons of product.

148.     As of 1989, CITGO estimated that between 90 and 95 million gallons of petroleum product passed through its Terminal annually.

149.     The CITGO Terminal tanks stored multiple products, including gasoline, kerosene, fuel oil, diesel, fuel additives, and other hazardous substances.

### _Spills, Leaks, and Other Releases Resulting from CITGO's Operations_

150.     Spills and leaks were inherent to CITGO's operations at and around Oil City.

21

151.    Before the 1970s, spills and leaks of petroleum products and hazardous substances were rarely documented or reported.

152.    Prior to 1970, to the extent that spilled or leaked petroleum products were considered a safety concern at all, they were concerning only because they created a risk of fires or explosions and not because they posed a risk to human health or the environment. Furthermore, the full effects of hazardous substances on human health and the environment were not well understood.

153.    Due to the general lack of reporting throughout the first several decades of Oil City operations, upon information and belief, far more spills, leaks, and other releases of petroleum, petroleum-related hazardous substances, and non-petroleum-related hazardous substances occurred at Oil City and the CITGO Terminal that went largely or entirely undocumented.

154.    Even after spills and leaks of petroleum products and hazardous substances became more regularly documented, upon information and belief, many spills and leaks at the CITGO Terminal went unreported.

155.    Documented spills and leaks at the CITGO Terminal include (but are not limited to) the following:

     a.  In 1967, a 700,000-gallon tank at the CITGO Terminal sprung a leak and spilled 13,000 to 15,000 gallons of gasoline into a dike and onto the ground.

     b.  In 1987, a spill occurred from a slop tank on the CITGO Terminal.

     c.  In 1991, fuel oil was discovered in the groundwater underneath a CITGO Terminal tank.

     d.  In 1992, a crack on pump housing at the CITGO Terminal caused a gasoline spill.

e. In 1993, a number 2 fuel oil spill occurred as a result of a line break on a transporter trailer.

f. In 1995, the City of Syracuse discovered contaminated soil at the CITGO Terminal while searching for an underground water leak.

g. In 1997, contaminated soil was discovered during the removal of two underground storage tanks at the CITGO Terminal.

156. From 1987 to 1991 (a period of just four years), there were at least 47 reported spills at Oil City.

157. Thirty-two spills were reported at Oil City in 1990 alone, suggesting that many spills went unreported prior to 1990.

158. At least as early as 1980, CITGO had a practice of receiving unmanned deliveries of petroleum products at the CITGO Terminal, meaning no one was present to stop the delivery if spills, leaks, or overflow occurred.

159. Upon information and belief, CITGO regularly spilled and leaked petroleum products during its operations at Oil City; CITGO's spills and leaks of petroleum products included (but were not limited to) the following:

a. Overfilling tanks, tank trucks, tank cars, barges, and tankers resulting in spills of various products;

b. Leaks in pipe and valve fittings at pipelines, tanks, and barges;

c. Spills from line flushing and pipe/tank changes;

d. Leaks and ruptures from aboveground and underground storage tanks;

e. Pipe damage by collision with equipment.

160.     National petroleum industry trade literature has long recognized that the average rate of loss into the environment incidental to petroleum storage operation is significant, with estimates ranging from 2% to 5% of total throughput.

161.     In 1996, EPA determined that at least 20% of the aboveground storage tanks older than 20 years at Oil City had corrosion failure (i.e., leaks of products due to rusting) and that most of the aboveground storage tanks at Oil City were over 20 years old.

162.     Furthermore, many of the tanks at the CITGO Terminal were built on extremely soft ground, and damage occurred to pipe connections and seals as the tanks settled into the earth, resulting in further leaks and spills.

163.     Upon information and belief, many damaged storage tanks and pipelines at the CITGO Terminal leaked significant quantities of petroleum comingled with hazardous substances (including rust from tank corrosion and solvents used to clean the tanks) into the soil and groundwater.

164.     Upon information and belief, CITGO also regularly spilled and leaked non-petroleum-related hazardous substances during its operations at the Oil City; CITGO's spills and leaks of petroleum-related hazardous substances included (but were not limited to) the following:

   a.   Spills and leaks from tanks and pipelines storing fuel additives (such as ethanol, xylene, and MBTE);

   b.   Spills and leaks of solvents used to clean equipment;

   c.   Corrosion of tanks and tank bottoms resulting in spills and leaks of product contaminated with rust, metals (including heavy metals), and other hazardous substances;

   d.   Spills of contaminated tank bottom sludge during tank cleanout;

    e.   Disposal and discharge of oil/water separator sludge contaminated with rust, heavy metals, solvents, and other hazardous substances.

    f.   Spills and leaks of sludge from slop tanks and oil/water separators.

165.    As a result of CITGO's documented and undocumented spills and leaks, the CITGO Terminal was and is extensively contaminated with petroleum and hazardous substances.

166.    A 1999 Consent Order between the DEC and CITGO required CITGO to perform extensive remediation, including but not limited to soil remediation, groundwater remediation, remediation of off-site discharges, and remediation operation and maintenance.

167.    As late as 2002, black staining and high organic content were observed in soil samples collected from property adjacent to the CITGO Terminal.

168.    Even after the remediation performed at the CITGO Terminal pursuant to the Consent Order, the CITGO Terminal was still so contaminated with petroleum products and other hazardous substances that it was added to the New York State Brownfield Cleanup Program following its sale to Carousel Landing Company, LLC in 2004.

169.    During the ordinary course of its operations at Oil City, CITGO also spilled, leaked, and (in some instances, intentionally) released petroleum, petroleum-related hazardous substances, and non-petroleum-related hazardous substances directly into the Barge Canal and Onondaga Lake.

170.    Upon information and belief, prior to 1972, runoff from the CITGO Terminal— which was contaminated with petroleum waste, rust, heavy metals, and other hazardous substances—was discharged directly into the Barge Canal.

171.    Beginning in 1972, runoff from the CITGO Terminal was channeled to an oil/water separator, where petroleum products were skimmed off and pumped to slop tanks.

172.    The remaining waters in the separator, which were contaminated with dissolved-phase hazardous substances, were discharged to the Barge Canal via an outfall.

173.    In 1989, CITGO requested to discharge waste water from a separate waste water treatment system into the Barge Canal via a second outfall.

174.    Upon information and belief, at various times the waste water treatment systems at the CITGO Terminal could not handle the volume of waste water being discharged, and therefore resulted in waste water bypassing any pre-treatment before discharge into the Barge Canal.

175.    In 1974, CITGO obtained a New York State Pollutant Discharge Elimination System ("SPDES") permit for discharges from its Terminal.

176.    But in a 1999 Consent Order relating to the cleanup of the groundwater at Oil City, DEC alleged that CITGO "ha[d] discharged and allegedly continue[d] to discharge petroleum to the groundwater" and these "*unpermitted* discharges . . . caused or contributed to contravention of groundwater standards" (emphasis added).

177.    CITGO also discharged other process and chemical wastes, including (without limitation) loading rack wash water, storage tank water drawoff, and spill wash water.

178.    Upon information and belief, these process and chemical wastes were contaminated with hazardous substances, including cleaning solvents.

179.    Upon information and belief, spills and leaks occurred during many more of CITGO's operations at and around Oil City, including (without limitation) during the transport of petroleum products to and from the CITGO Terminal, during the transfer of petroleum products to and from pipelines within the CITGO Terminal, during the transfer of petroleum products to and from trucks in the CITGO Terminal's loading areas, during the transfer of petroleum

26

products to and from barges, and from the barges during transport through the Barge Canal and across Onondaga Lake.

180.    A 1971 study of oil pollution in New York State found that spills and leaks (resulting from, for example, ruptured hose lines, negligent operation of valves and shut-offs, and overpumping) often occurred during ship-to-shore or shore-to-ship transfers of petroleum products, like those occurring at the CITGO Terminal.

181.    Indeed, beginning early in Oil City's history, the New York State Department of Health recognized that barge transfer operations at Oil City were a significant source of potential pollution and caused much of the accumulated oil and grease along the Barge Canal.

182.    Upon information and belief, barges owned, operated, and/or arranged for by CITGO also dumped bilge and ballast waters contaminated with petroleum waste, rust, heavy metals, and chlorinated solvents directly into the Barge Canal and Onondaga Lake.

183.    Rather than remaining at the Oil City docks for overnight storage, many of these barges were towed out into Onondaga Lake, resulting in further opportunities for direct discharges into the Lake.

### _Contaminants Associated with CITGO's Operation at Oil City_

184.    In the ordinary course of its operations at and around Oil City, CITGO released a variety of contaminants onto the Oil City parcels, into the Barge Canal, and directly into Onondaga Lake.

185.    The contaminants released by CITGO included, but were not limited to, petroleum products, petroleum products comingled with hazardous substances, petroleum products containing increased concentrations of hazardous substances, petroleum-related

hazardous substances, and non-petroleum-related wastes, solvents, and other hazardous substances.

186.    PAHs are one of the most significant contaminants potentially resulting from spills and leaks from petroleum storage and transport operations.

187.    Heavier petroleum products persist in the environment because they contain higher molecular weight PAHs.

188.    While all PAHs spilled and/or leaked by CITGO may be harmful to human health and the environment and have contributed to Honeywell's need to remediate the Onondaga Lake Bottom Subsite, higher molecular weight PAHs are more persistent in the environment than lighter molecular weight PAHs.

189.    Diesel and number 2 fuel oil are heavier petroleum products than gasoline.

190.    Number 4 fuel oil is heavier than number 2 fuel oil.

191.    Number 6 fuel oil is heavier than number 4 fuel oil.

192.    CITGO transported, arranged for transport, and stored large volumes of these heavier PAH-containing petroleum products.

193.    A 1989 Industrial Chemical Survey states that CITGO had 3.8 million gallons of gasoline and 3 million gallons of fuel oil and diesel fuel on hand at the CITGO Terminal at the time of the survey.

194.    Upon information and belief, the percentage of heavier product stored at the CITGO Terminal was higher in earlier years when CITGO relied more heavily on barge transport.

195.    From 1918 to 1980, an estimated 900 million gallons of products at least as heavy as number 2 fuel oil passed through the Oil City area.

196.    It is estimated that a significant percentage of the spills and leaks that occurred at Oil City, including at the CITGO Terminal, were spills or leaks of the higher molecular weight PAH petroleum products.

197.    All petroleum products degrade or weather when released into the environment.

198.    When lighter petroleum products are released into the environment, they degrade such that a greater portion are high molecular weight PAHs.

199.    In addition to PAHs, petroleum products also contain more volatile hazardous substances like BTEX compounds.

200.    Significant quantities of BTEX were located in the remediated areas of the Onondaga Lake Bottom nearest to Oil City.

201.    Significant quantities of BTEX were found both in the soil and in the groundwater at the CITGO Terminal.

202.    In addition to contaminants spilled or leaked through petroleum and petroleum-related hazardous substances, CITGO also spilled and leaked contaminants contained in non-petroleum-related hazardous substances.

203.    For example, upon information and belief, spills and leaks of chlorinated solvents used in equipment cleaning were inherent to CITGO's operations at its Terminal.

204.    Upon information and belief, the chlorinated solvents released by CITGO contained volatile organic compounds ("VOCs"), which are not constituents found in petroleum products.

205.    VOCs have been found in the soil and groundwater at Oil City  as well as in the Onondaga Lake Bottom Subsite.

206.   VOCs found at Oil City include carbon tetrachloride, chlorobenzene, methylene chloride, trichloroethylene ("TCE"), vinyl chloride, 1,3-butadien, 1,4-dichlorobenzene, 1,1-dichloroethane, 1,2-dichloroethane, 1-3-dichloroethene, tetrachloroethylene ("PCE"), and 1,2,4-trichlorobenzene.

207.   DEC has identified at least the following (petroleum-related and non-petroleum-related) contaminants as current or pre-remediation contaminants of concern in the CITGO Terminal area:  arsenic, benzene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, butylbenzenes, chrysene, copper, ethylbenzene, indeno(1,2,3-cd)pyrene, lead, mercury, methyl tert-butyl ether ("MTBE"), naphthalene, n-propylbenzene, propylbenzenes, petroleum products, phenanthrene, trimethylbenzenes, and xylenes.

### *Pathways from CITGO's Operations to Onondaga Lake and SYW-12*

208.   Environmental contaminants released by CITGO through spills, leaks, and discharges of petroleum products and non-petroleum-related hazardous substances made their way to the Lake through various pathways.

209.   Many contaminants from CITGO's operations at Oil City were directly introduced into Onondaga Lake.

210.   Barges owned, operated, and/or arranged for by CITGO for the transport of petroleum products to and from Oil City traversed Onondaga Lake on their way to the Barge Canal.

211.   Upon information and belief, barges owned, operated, and/or arranged for by CITGO spilled and leaked large quantities of petroleum products and hazardous substances (such as ballast water contaminated with rust, heavy metals, cleaning solvents, and other wastes) directly into the Lake.

30

212. CITGO also spilled, leaked, or otherwise released petroleum products and non-petroleum-related hazardous substances into sanitary sewers.

213. In 1971, the Onondaga County Department of Drainage and Sanitation investigated explosive conditions in sewer lines in the vicinity of Oil City and noted numerous problems with "gasoline and fuel oil entering the pump station via the storm and sanitary sewer system."

214. Contaminants spilled, leaked, or released into sanitary sewers on the CITGO Terminal were transported to the publicly owned treatment plant called Metro.

215. Metro was located on the southern bank of Onondaga Lake and discharged contamination, including a portion of the contamination it received from the CITGO Terminal, directly into the Lake.

216. A portion of contaminants spilled or leaked into the subsurface of the CITGO Terminal (or otherwise released by CITGO elsewhere in the Onondaga Lake basin) were transported through groundwater and/or non-aqueous phase liquid directly to the Lake.

217. Contaminants from the CITGO Terminal were also introduced to the Lake via the Barge Canal.

218. A portion of contaminants spilled or leaked into storm sewers on CITGO's Oil City properties were discharged directly into the Barge Canal.

219. Floating oil was observed regularly along the Barge Canal throughout Oil City's history.

220. In 1966, the New York State Department of Health was so concerned with Oil City's discharges to the Barge Canal that it ordered the hiring of a consultant specifically to study oil pollution resulting from discharges to the sewer system by the Oil City tank farms.

221.    In 1971, there was so much petroleum and petroleum-related hazardous substances accumulated in the sanitary sewers on and around the Oil City properties that explosive conditions existed.

222.    A portion of contaminants spilled or leaked into the subsurface of the CITGO Terminal was transported through groundwater and/or non-aqueous phase liquid to the Barge Canal and then into the Lake.

223.    A portion of CITGO's contaminants that were discharged to the Barge Canal was transported through the sediments of the Barge Canal into the Lake.

224.    A portion of CITGO's contaminants that was discharged to the Barge Canal was also dredged from the sediments of the Barge Canal and deposited in the Lake or on SYW-12.

225.    The Barge Canal was dredged on a regular basis throughout Oil City's history.

226.    This dredge material was historically deposited on the SYW-12 area and in Onondaga Lake.

227.    As a result, the contamination that CITGO contributed to Barge Canal sediments was transported from Barge Canal directly to SYW-12 and the Lake.

228.    Beginning in the 1940s, dredging of the Barge Canal was necessary every three or four years, and the dredged silt was pumped to a swampy part of the shore of Onondaga Lake near the Barge Canal terminal, presumably SYW-12.

229.    Dredging of the Barge Canal continued throughout the 1950s, 60s, and 70s. During certain time periods, the Barge Canal was dredged annually.

230.    A 1946 New York State Department of Health report acknowledges that dredge material from the Barge Canal was pumped to the shore of the southeast corner of the Lake, where unsightly, black, odorous sludge banks were formed.

32

231.    The 1946 report includes a map showing the location where this dredge was deposited, and the area is the location of SYW-12.

232.    A 1947 memorandum by the New York State Department of Health found that Onondaga Lake was visibly polluted with foreign material affecting at times over half of the area of the Lake and including oil, grease, soot, debris, and both floating and suspended solids of sewage and industrial origin. The 1947 memorandum specifically pointed to dredge spoils from the Barge Canal as a source of the Lake pollution.

233.    In 1959, a temporary pipeline was installed parallel to the Barge Canal to pump sludge dredged from the Barge Canal to Onondaga Lake.

234.    In 1960, new dredging equipment was installed in the Barge Canal to maintain adequate channel depths.

235.    A photograph from 1962 shows a hydraulic dredge at work deepening the deepening the Barge Canal channel near Hiawatha Boulevard.   The photograph's caption states that dredging operations are carried out on the Barge Canal "every two or three years."

236.    In 1963, a hydraulic dredge was again used to deepen the Barge Canal in preparation for the winter season.

237.    A photograph from 1964 shows a dredge "scooping off high spots" in the Barge Canal to accommodate large commercial barges.

238.    By 1966, "layer after layer of silt" had accumulated in the bottom of the Barge Canal and dredging was necessary for Barge Canal traffic to continue.

239.    A 1966 newspaper article reported that dredging of the Onondaga Lake channel occurred annually.

240.    An aerial photograph from 1966 shows a hydraulic dredge deepening the Barge Canal channel and depositing dredged sediments on SYW-12.   The photo also shows a plume of the sediment deposited onto SYW-12 being transported from the wetland area out into Onondaga Lake.

241.    Upon information and belief, after 1966, sediments dredged from the Barge Canal channel were pumped to the west bank of the Barge Canal, where they continued to drain contaminated water back into the Canal.

242.    A 1972 photograph shows a hydraulic dredge being used to pump out "salt, gravel, silt, and other waste" accumulated at the bottom of the Barge Canal.   Upon information and belief, the dredged waste was pumped to the west bank of the Barge Canal, where the solid material settled out and the contaminated waters drained back into the Barge Canal.

243.    Within Barge Canal, higher concentrations of PAHs occur at deeper sample intervals (*i.e.*, deeper in the sediments).

244.    Given the hydrodynamics and environment of the Barge Canal, impacts that occurred earlier in time are more likely to be present in deeper sediments.

245.    The existence of higher PAH concentrations in the deeper sediments of Barge Canal confirms that more petroleum-related contamination was contributed during the height of Oil City's operations.

246.    The concentrations of PAHs at the deeper sample intervals within Barge Canal are higher than the pre-dredge concentrations of PAHs in the Onondaga Lake Bottom Subsite.

247.    Samples collected by the New York Thruway Authority in 2016 show that to this day, more than 20 years since Oil City operations ceased, the Barge Canal is still heavily contaminated with PAHs.

34

### *Contamination in the Lake Resulting from CITGO's Operations at Oil City*

248.    Due, in part, to the spills, leaks, discharges, and other releases from CITGO's Oil City operations discussed above, Onondaga Lake became heavily contaminated with comingled petroleum products, petroleum wastes, and non-petroleum hazardous substances.

249.    By 1966, a Syracuse Post Standard article described "dirty Onondaga Lake" as already "long written off as a lost cause."

250.    A 1990 New York Times article referred to Oil City as "an industrial wasteland of oil tanks, junkyards, toxic dumps, and corroded buildings hugging the shore of Onondaga Lake."

251.    The New York Supreme Court, Onondaga County, in a proceeding related to the redevelopment of Oil City, stated that the Oil City area properties "were eyesores to all who traveled in and through the City of Syracuse for a century and beyond" and "[t]he property today continues to be an eyesore to the general public, a detriment to builders of any type of kind, and has caused significant deterioration in and around the area of the immediate North and Northwest part of the City of Syracuse."  *Destiny USA Dev., LLC v. New York State Dep't of Envtl. Conservation*, 19 Misc. 3d 1144(A) at 5–6, 867 N.Y.S.2d 16 (N.Y. Sup. Ct. Onondaga Cnty. 2008), *aff'd as mod.*, 63 A.D.3d 1568, 879 N.Y.S.2d 865 (N.Y. Sup. Ct. App. Div. 4th Dep't 2009).

252.    The New York Supreme Court went on to conclude that "[t]he 'Oil City Parcel' is comprised of approximately 14 separate tax parcels formerly owned by major oil companies, including, among others, CITGO . . . Petroleum and hazardous substances, including soils contaminated by petroleum, metals, volatile organic compounds, solvent waste, and PCB's [sic] among other contaminants are present throughout the 'Oil City Parcel' as a result of these prior industrial uses and activities."  *Id*.  The Court also concluded that "[i]t is undisputed that ground

water throughout the 'Oil City Parcel' is also known to be contaminated as a result of these prior industrial uses." *Id*.

253.    The New York Supreme Court also acknowledged that "contamination entering the lake from groundwater emanating from [Oil City]" contributed to the pollution of Onondaga Lake. *Id*.

254.    The ROD for the Onondaga Lake Bottom Subsite specifically identifies Oil City as a contributor of hazardous substances to Onondaga Lake.

255.    Much of the contamination found in the areas of the Lake adjacent to Oil City, Barge Canal, and SYW-12 originated from Oil City operations, including CITGO's operations.

256.    For example, the ROD concluded that one of the areas with the highest concentration of high molecular weight PAHs was the area off the former Oil City shoreline.

257.    The Onondaga Lake Bottom Subsite remediation area directly adjacent to the Oil City area and SYW-12 and into which Barge Canal discharges is referred to as Sediment Management Unit 6 ("SMU 6").

258.    PAHs are the predominant remedial driver in SMU 6.

259.    PAHs contributed significantly to the need to remediate in 100% of the areas in SMU 6 requiring remediation.

260.    Anthropogenic PAHs in the environment fall into two predominant categories: petrogenic and pyrogenic.

261.    Petrogenic PAH contamination results from petroleum products and petroleum wastes, whereas pyrogenic PAHs result from combustion of materials such as oil, coal, and vegetation.

262.    When compared against petrogenic and pyrogenic signatures, the PAHs present in SMU 6 predominately show a petrogenic, or petroleum-based, signature.

263.    This suggests the PAH contamination in SMU 6 is predominantly a result of petroleum products and petroleum wastes leaked or spilled into the environment.

264.    CITGO was a major operator within the Oil City area.

265.    The location, concentrations, and forensic composition of PAHs in SMU 6 confirm that Oil City operations, including CITGO's operations, are the predominant source contributing to the need to remediate that area of the Lake.

266.    CITGO's contamination—from both petroleum and non-petroleum-related sources—also contributed to the need to remediate other areas of the Onondaga Lake Bottom Subsite.

### *Contamination in SYW-12 Resulting from CITGO's Operations at Oil City*

267.    Beginning at least as early as 1946, dredged material from the Barge Canal was pumped from the Barge Canal bottom to the SYW-12 area and unsightly, black, odorous sludge banks were formed.

268.    Upon information and belief, material dredged from the Barge Canal was pumped from the Barge Canal and deposited on SYW-12 until at least 1966.

269.    As a result of this pumping and deposition, contaminants present in the Barge Canal were transported directly to SYW-12.

270.    These contaminants include contaminants contributed to the Barge Canal by CITGO through its Oil City operations.

271.    Honeywell's investigations of SYW-12 have revealed stained soils with petroleum odors and oil sheen on groundwater.

272.     PAHs were detected in every surface soil sample collected at SYW-12.

273.     In addition to PAHs, other comingled petroleum- and non-petroleum-related contaminants were detected at SYW-12, including chlorinated benzenes, BTEX, carbon disulfide, 2-butanone, methylene chloride, acetone, PCBs (including Aroclor 1254 and 1260), cadmium, copper, lead, mercury, zinc, nickel, chromium, beryllium, silver, and arsenic.

274.     When compared against petrogenic and pyrogenic signatures, the PAHs present at SYW-12 suggest contributions from both petrogenic and pyrogenic sources, meaning a portion of the PAH contamination is from petroleum sources.

275.     The location, concentrations, and forensic composition of PAHs in SYW-12 confirm that the Oil City operations are the predominant source of petrogenic PAHs at SYW-12.

276.     Upon information and belief, CITGO contributed a major portion of the Oil City petrogenic PAHs that came to rest in SYW-12.

277.     In addition, the location, concentrations, and/or forensic composition of BTEX and chlorinated benzene contaminants on SYW-12 suggests that the Oil City operations, including CITGO's operations, were the source of at least some of these contaminants on SYW-12.

278.     Upon information and belief, CITGO's operations also contributed to the presence of non-petroleum-related hazardous substances (such as PCBs, cadmium, copper, mercury, zinc, nickel, chromium, beryllium, silver, and arsenic) comingled with the petroleum-related contaminants at SYW-12.

### *Procedural History/Prior Negotiations Regarding These Claims*

279.     CITGO entered a tolling agreement with Honeywell on December 9, 2009, and has agreed to toll the claims asserted herein until September 30, 2019.

280. The tolling agreement entered between Honeywell and CITGO provides that the agreement is binding upon "their respective parent companies, subsidiaries, predecessors, successors, and assigns."

281. Honeywell first presented the full detail of these claims to CITGO in 2013; the presentation included a written demand for a sum certain that would have resolved all of CITGO's liability under the claims asserted herein.

282. Despite six years of intensive negotiations, including multiple rounds of offers and counteroffers, CITGO has unreasonably minimized its liability, and the parties have failed to reach a settlement regarding these claims.

## COUNT ONE

## CERCLA COST RECOVERY CLAIM FOR SYW-12 RESPONSE COSTS

283. Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

284. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part that:

" . . . (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepted any hazardous substance for transport to . . . sites selected by such person, from which there is a release, or threatened release which causes the

incurrence of response costs . . . shall be liable for. . .any . . . necessary costs of response incurred by any other person consistent with the national contingency plan."

285.   CITGO and Honeywell are "persons" within the meaning of section 101(21),107(a), 113(f)(1), and 113(f)(3)(B) of CERCLA, 42 U.S.C. §§ 9601(21), 9607(a), 9613(f)(1), 9613(f)(3)(B).

286.   CITGO's Oil City properties, terminals, pipelines, barges, sewers, pipes and tributaries to Onondaga Lake, and Onondaga Lake are all "facilities" within the meaning of sections 101(9) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(9), 9607(a).

287.   CITGO "disposed" of hazardous substances at its facilities, within the meaning of sections 101(14), 101(29), and 107(a) of CERCLA, 42 U.S.C. §§ 9601(14), (29),  9607(a).

288.   CITGO "released" and/or "threatened release" of "hazardous substances" into the environment at or from its facilities, as those terms are defined in CERCLA sections 101(8), (9), (14), (22), and 107(a), 42 U.S.C. §§ 9601(8), (9), (14), (22), and 9607(a).

289.   At the time of its disposal and release of hazardous substances, CITGO was an "owner" and/or "operator" of one or more facilities, including the CITGO Terminal and pipelines, within the meaning of section 101(20) and 107(a) of CERCLA, 42 U.S.C. § 9601(20), 9607(a).

290.   CITGO arranged for disposal of hazardous substances owned or possessed by CITGO and other parties at one or more facilities, including, but not limited to, CITGO's and others' Oil City properties, terminals, pipelines, sewers, pipes, and tributaries to Onondaga Lake, the Onondaga Lake Bottom Subsite, and SYW-12, within the meaning of section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

291.    CITGO's disposals and releases have contributed hazardous substances to SYW-12.

292.    Honeywell has incurred, and will continue to incur, "necessary costs of response. . . consistent with the national contingency plan" in the course of its investigation of SYW-12.  42 U.S.C. § 9607(a)(4)(B).  These costs were incurred voluntarily by Honeywell.

293.    Accordingly, CITGO is jointly and severally liable under Section 107 of CERCLA for the necessary costs of response incurred in investigating and remediating SYW-12.

294.    Section 113(g)(2) of CERCLA, 42 U.S.C § 9613(g)(2), provides that for cost recovery actions pursuant to Section 107, 42 U.S.C. § 9607, where future costs are anticipated, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

295.    Honeywell will continue to incur response costs in investigating the environmental contamination at SYW-12, and these costs are recoverable pursuant to section 107 of CERCLA, 42 U.S.C. § 9607.  A declaratory judgment is therefore appropriate defining CITGO as jointly and severally liable for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against CITGO.

## COUNT TWO

## CERCLA CONTRIBUTION CLAIM FOR RESPONSE COSTS

296.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

297.    CITGO disposed of and released hazardous substances at its Oil City facilities during the time of its ownership thereof, and these disposals and releases have contributed

hazardous substances to the Onondaga Lake Superfund Site—specifically, to the Onondaga Lake Bottom Subsite and SYW-12.

298.    CITGO transported hazardous substances for disposal in Onondaga Lake and on SYW-12, which locations were selected by CITGO and which disposal has contributed to the presence of hazardous substances in the Onondaga Lake Bottom Subsite and SYW-12.

299.    CITGO also arranged for the disposal of hazardous substances owned by CITGO in Onondaga Lake and on SYW-12, which has contributed to the presence of hazardous substances in the Onondaga Lake Bottom Subsite and SYW-12.

300.    Disposal and releases of hazardous substances from barges owned and/or arranged by CITGO during transport of such substances also contributed to the presence of hazardous substances in the Onondaga Lake Bottom Subsite.

301.    Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), provides in pertinent part that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 . . . or under section 9607(a)."

302.    Additionally, section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), provides that "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to [the] settlement."

303.    In the 2007 Consent Decree, Honeywell resolved its liability to the State of New York for some or all of the costs of the Onondaga Lake Bottom Subsite RI/FS and the ROD

remedy, both of which constitute response actions within the meaning of CERCLA Section 101(2), 42 U.S.C. § 9601(25).

304.    The 2007 Consent Decree constitutes a judicially approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

305.    Furthermore, all the costs Honeywell has incurred, and will incur, pursuant to the 2007 Consent Decree constitute necessary costs of response incurred consistent with the National Contingency Plan ("NCP") under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

306.    In the 2018 Response Costs Consent Decree, Honeywell resolved its liability to the United States for its costs incurred in overseeing the investigation and remediation of the Onondaga Lake Bottom Subsite, which constitute response actions within the meaning of CERCLA.  42 U.S.C. § 9601(25).  The 2018 Response Costs Consent Decree constitutes a judicially approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

307.    Furthermore, all the costs Honeywell has incurred pursuant to the 2018 Response Costs Consent Decree constitute necessary costs of response incurred consistent with, and not inconsistent with, the NCP under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

308.    CITGO is liable under Section 107 of CERCLA for the necessary costs of response incurred in investigating and remediating the Onondaga Lake Bottom Subsite and in investigating SYW-12.

309.    CITGO was not party to the 2007 Consent Decree nor the 2018 Response Costs Consent Decree.

310.    Accordingly, CITGO is liable to Honeywell under Section 113 of CERCLA for an equitable share of the necessary costs of response incurred by Honeywell, consistent with the

NCP, with regard to the Onondaga Lake Bottom Subsite and SYW-12, including costs incurred pursuant to the 2007 Consent Decree and the 2018 Response Costs Consent Decree.

311.    The federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

312.    An actual controversy currently exists between Honeywell and CITGO with regard to CITGO's liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at Onondaga Lake.  Honeywell will continue to incur costs pursuant to the 2007 Consent Decree and in the investigation of SYW-12.  A declaratory judgment is therefore appropriate defining CITGO's liability for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against CITGO.

## COUNT THREE

## CERCLA CONTRIBUTION CLAIM FOR NRD COSTS

313.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

314.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" shall be liable "for . . . damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

315.    CITGO's disposals and releases have contributed hazardous substances that caused injury to, destruction of, or loss of natural resources at the Onondaga Lake Superfund Site.

316.    In the 2018 NRD Consent Decree, Honeywell resolved its liability to the Onondaga Lake Trustees for some or all of the NRD at the Onondaga Lake Superfund Site.  The 2018 NRD Consent Decree constitutes a judicially approved settlement within the meaning of section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).  Furthermore, the costs Honeywell has incurred, and will incur, pursuant to the 2018 NRD Consent Decree constitute payment for NRD costs under section 107(a)(4)(c) of CERCLA, 42 U.S.C. § 9607(a)(4)(C).

317.    CITGO is liable under section 107 of CERCLA, 42 U.S.C. § 9607, for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss at the Onondaga Lake Superfund Site resulting from the releases of hazardous substances at or from CITGO's Oil City facilities.

318.    CITGO was not a party to the 2018 NRD Consent Decree.

319.    Accordingly, CITGO is liable to Honeywell under section 113 of CERCLA, 42 U.S.C. § 9613, for an equitable share of the costs incurred by Honeywell pursuant to the 2018 NRD Consent Decree.

320.    An actual controversy currently exists between Honeywell and CITGO with regard to CITGO's liability for the costs that Honeywell has incurred in connection with the 2018 NRD Consent Decree.  Honeywell will also continue to incur NRD costs in connection with the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining CITGO's liability for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover NRD costs against CITGO.

## COUNT FOUR

## OPA CONTRIBUTION CLAIM

321.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

322.    Section 1002 of OPA, 33 U.S.C. § 2702, provides in pertinent part, as follows:

323.    Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for . . . any removal costs incurred by any person . . . which are consistent with the National Contingency Plan . . . [and] [d]amages for injury to, destruction of, loss of, loss of use of, natural resources, including the reasonable costs of assessing the damage.

324.    Honeywell is a "person" within the meaning of sections 1001(27), 1002, and 1009 of OPA, 33 U.S.C. §§ 2701(27), 2702, 2709.

325.    Honeywell has incurred removal costs consistent with the NCP, as defined by section 1001(19) of OPA, 33 U.S.C. § 2701(19), and NRD costs at the Onondaga Lake Superfund Site, including the Onondaga Lake Bottom Subsite and SYW-12.

326.    The Onondaga Lake Bottom Subsite of the Onondaga Lake Superfund Site and SYW-12 include navigable waters and adjoining shorelines, as defined in section 1001(21) of OPA, 33 U.S.C. § 2701(21).

327.    CITGO is a responsible party, as defined in section 1001(32) of OPA, 33 U.S.C. § 2701(32).

328.     At times following OPA's enactment, CITGO owned or operated "facilities" from which oil was "discharged" into the Onondaga Lake Bottom Subsite and SYW-12, within the meaning of sections 1001(9) and 1002 of OPA, 33 U.S.C. §§ 2701(9), 2702.

329.     CITGO also owned and operated "vessels" from which oil was discharged into the Onondaga Lake Bottom Subsite, within the meaning of sections 1001(9) and 1002 of OPA, 33 U.S.C. §§ 2701(9), 2702.

330.     CITGO's discharges and releases of oil resulted in injury to, destruction of, loss of, and/or loss of use of, natural resources.

331.     Honeywell presented to CITGO the full details of its claim for contribution in connection with CITGO's discharges and releases of oil, including a written demand for a sum certain, in 2013.

332.     CITGO is liable in contribution to Honeywell under sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709, 2717, for oil-related removal costs incurred consistent with the NCP, and not inconsistent with the NCP, at the Onondaga Lake Bottom Subsite and SYW-12.

333.     CITGO is liable in contribution to Honeywell under sections 1009 and 1017 of OPA, 33 U.S.C. §§ 2709, 2717, for damages for injury to, or economic losses resulting from destruction of, loss of, and/or loss of use of, natural resources, including the reasonable costs of assessing the damage.

334.     An actual controversy currently exists between Honeywell and CITGO with regard to CITGO's liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at the Onondaga Lake Superfund Site and SYW-12 and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the

environmental contamination at the Onondaga Lake Bottom Subsite.  Honeywell will also continue to incur response costs in investigating the environmental contamination at SYW-12. Honeywell will also continue to incur costs pursuant to the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining CITGO's liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against CITGO.

## COUNT FIVE

## NEW YORK NAVIGATION LAW CONTRIBUTION CLAIM

335.    Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

336.    Section 181(1) of the New York Navigation Law ("Act"), N.Y. Nav. Law § 181(1), provides that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained."

337.    CITGO is a "person" who "discharged" "petroleum," as those terms are defined by N.Y. Nav. Law §§ 172(14), (8), and (15), at the Onondaga Lake Bottom Subsite and SYW-12.

338.    CITGO's "petroleum" "discharges" into Onondaga Lake and SYW-12 were into the waters of the State of New York and/or onto lands from which the discharges might flow or drain into those waters.

339.    CITGO's petroleum discharges caused direct and indirect damages to the natural resources of Onondaga Lake.

340.     A portion of the costs Honeywell has incurred and will incur pursuant to the 2018 NRD Consent Decree are direct or indirect damages caused by CITGO's petroleum discharges.

341.     Section 176(8) of the Act, N.Y. Nav. Law § 176(8), provides that "every person providing cleanup, removal of discharge of petroleum . . . pursuant to this section [of the Act] shall be entitled to contribution from any other responsible party."

342.     Section 181(2) of the Act, N.Y. Nav. Law § 181(2), defines "cleanup and removal costs" to include "[t]he cost of restoration and replacement, where possible, of any natural resource damaged or destroyed by a discharge."

343.     CITGO is a "responsible party" under N.Y. Nav. Law § 176(8) with regard to the petroleum discharges at Oil City.

344.     Honeywell is a "person" that has incurred, and will continue to incur, "cleanup and removal" costs, as that phrase is defined by N.Y. Nav. Law § 172(5), at the Onondaga Lake Bottom Subsite and SYW-12.

345.     Honeywell's cleanup and removal at the Onondaga Lake Bottom Subsite and SYW-12 were undertaken with the approval of DEC.

346.     Honeywell's actions related to the "cleanup and removal" of "petroleum" at the Onondaga Lake Bottom Subsite and SYW-12 have been in accordance with the NCP, codified at 40 C.F.R. Part 300, and as required by N.Y. Nav. Law § 176(4).

347.     CITGO is liable to Honeywell for contribution of the costs of cleanup and removal of petroleum discharges that Honeywell has incurred, and will continue to incur, with respect to the investigation and remediation of the Onondaga Lake Bottom Subsite and the investigation of SYW-12.

348.     CITGO is liable to Honeywell for contribution of NRD costs incurred pursuant to the 2018 NRD Consent Decree.

349.     An actual controversy currently exists between Honeywell and CITGO with regard to CITGO's liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at Onondaga Lake, SYW-12, and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the environmental contamination at Onondaga Lake.  Honeywell will also continue to incur substantial response costs in investigating the environmental contamination at SYW-12.  Honeywell will also continue to incur substantial costs in connection with the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining CITGO's liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs against CITGO.

## COUNT SIX

## STATE LAW CONTRIBUTION CLAIM

350.     Honeywell repeats and incorporates herein by reference the allegations of all of the foregoing paragraphs.

351.     Section 1401 of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. § 1401, and common law provide that if two or more persons are subject to liability for damages or costs for the same injury, one person may claim contribution from the other for any damages or costs incurred by that person in excess of his or her equitable share.

352.     Honeywell and CITGO are both liable for contamination at Onondaga Lake that has resulted in and will result in the incurrence of costs by Honeywell pursuant to the 2007

Consent Decree, the 2018 Response Costs Consent Decree, the 2018 NRD Consent Decree, and in the investigation of SYW-12.

353.     As a direct and proximate result of the acts and/or omissions of CITGO, Honeywell has incurred, and will incur in the future, costs pursuant to the 2007 Consent Decree, the 2018 Response Costs Consent Decree, the 2018 NRD Consent Decree, and the investigation of SYW-12, in excess of its equitable share.

354.     An actual controversy currently exists between Honeywell and CITGO with regard to CITGO's liability for the costs that Honeywell has incurred, and will incur, in connection with the environmental contamination at Onondaga Lake, SYW-12, and in connection with the 2018 NRD Consent Decree.  Pursuant to the 2007 Consent Decree, Honeywell will continue to incur substantial response costs in addressing the environmental contamination at Onondaga Lake.  Honeywell will also continue to incur substantial response costs in investigating the environmental contamination at SYW-12.  Honeywell will also continue to incur substantial costs pursuant to the 2018 NRD Consent Decree.  A declaratory judgment is therefore appropriate defining CITGO's liability to Honeywell for these future costs that will be binding in any subsequent action or actions that Honeywell may bring to recover response costs and costs incurred in connection with the 2018 NRD Consent Decree against CITGO.

## RELIEF REQUESTED

355.     WHEREFORE, Honeywell requests judgment in its favor:

356.     Declaring CITGO, pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), to be jointly and severally liable for response, removal, and/or cleanup costs incurred or to be incurred by Honeywell with respect to the investigation of environmental contamination at

SYW-12, plus interest and costs, attorneys' fees, and such other relief as the Court may deem appropriate and just.

357.    Ordering CITGO, pursuant to section 113(f) of CERCLA, 42 U.S.C. § 9613(f), Sections 1002, 1009, and 1017 of OPA, 33 U.S.C. §§ 2702, 2709, 2717, N.Y. Nav. Law § 176(8), N.Y. C.P.L.R. § 1401, and/or common law, contribute its equitable share of response, removal, and/or cleanup costs incurred or to be incurred by Honeywell with respect to the investigation and remediation of environmental contamination at the Onondaga Lake Bottom Subsite and SYW-12, plus interest and costs, attorneys' fees, and such other relief as the Court may deem appropriate and just.

358.    Entering a declaratory judgment, which will be binding in any subsequent action or actions that Honeywell may bring to recover response, removal, and/or cleanup costs against CITGO, that CITGO is liable for its equitable share of response costs that Honeywell may incur in the investigation and cleanup of environmental contamination at the Onondaga Lake Bottom Subsite and SYW-12.

359.    Ordering CITGO, pursuant to section 113(f) of CERCLA, 42 U.S.C. § 9613(f), Sections 1002, 1009, and 1017 of OPA, 33 U.S.C. §§ 2702, 2709, 2717, N.Y. Nav. Law § 176(8), N.Y. C.P.L.R. § 1401, and/or common law, contribute its equitable share of NRD costs incurred or to be incurred by Honeywell pursuant to the 2018 NRD Consent Decree, plus interest and costs, attorneys' fees, and such other relief as the Court may deem appropriate and just.

360.    Entering a declaratory judgment, which will be binding in any subsequent action or actions that Honeywell may bring to recover costs incurred pursuant to the 2018 NRD Consent Decree against CITGO, that CITGO is liable for its equitable share of NRD costs that Honeywell may incur pursuant to the 2018 NRD Consent Decree.

## **DEMAND FOR JURY TRIAL**

361.   Honeywell hereby demands trial by jury of any and all issues so triable.


 Dated:  September 30, 2019


Of Counsel:                                           ALLEN & DESNOYERS LLP


                                                 By:  */s/ Dale A. Desnoyers*
                                                      Dale A. Desnoyers, NDNY Bar No.: 103795
                                                      Allen & Desnoyers LLP
                                                      90 State Street, Suite 1009
                                                      Albany, New York 12207
                                                      (518) 426-2288
                                                      dale@allendesnoyers.com

                                                      ARNOLD & PORTER KAYE SCHOLER
                                                      LLP

                                                      Brian D. Israel, NDNY Bar No.: 514704
                                                      Geoffrey Michael, NDNY Bar No.: 518110
                                                      Lauren Daniel, NDNY Bar No.: 700114
                                                      Arnold & Porter Kaye Scholer LLP
                                                      601 Massachusetts Ave. NW
                                                      Washington, DC 20002
                                                      (202) 942-6546
                                                      brian.israel@arnoldporter.com
                                                      geoffrey.michael@arnoldporter.com
                                                      lauren.daniel@aporterporter.com

                                                      *Attorneys for Honeywell International Inc.*